## THE BOARD OF SUPERVISORS OF THE COUNTY OF SACRAMENTO *v.* CHARLES L. BIRD *et als.*

ACTION AGAINST DEFAULTING TREASURER OF SACRAMENTO COUNTY. — An action against a defaulting Treasurer and his securities, for money belonging to the County of Sacramento, if the defalcation occurred after the passage of the Act of April 25th, 1863, providing for the government of the County of Sacramento, is properly brought in the name of the Board of Supervisors of the County of Sacramento, instead of that of the People of the State of California.

ADMISSION OF EXECUTION OF BOND SUED ON.—If a copy of the bond sued on is set out in the complaint, an answer denying its execution which is not verified admits its due execution.

DEFECT IN OFFICIAL BOND.—If there is a defect in an official bond by the failure of the principal to place a seal opposite his name, the defect will not defeat a recovery thereon as against the sureties if the defect is suggested in the complaint.

EXECUTION AND DELIVERY OF OFFICIAL BOND.—When an official bond, proper in form and substance, is signed and sealed by the obligors, and approved by the proper officer, and filed in the office appointed by law, it is both executed and delivered to the people of the State of California.

SURPLUS ALLEGATIONS IN COMPLAINT. — Allegations in a complaint which are absurd, and the truth of which is impossible, and which are inconsistent with other allegations in the same complaint, may be disregarded as surplusage.

MONEY IN COUNTY TREASURY.—Money in the County Treasury is presumptively the money of the county, and money illegally withdrawn by the Treasurer will be held to belong to the county until the contrary is shown.

COMPLAINT IN ACTION ON OFFICIAL BOND.—In an action on an official bond of a County Treasurer, if the complaint avers only a breach by a failure of the Treasurer to keep the money in the county safe, and by a withdrawal of the same and

conversion to his own use, a recovery cannot be had for a failure of the Treasurer to pay into the Treasury his commissions retained on payments made to the State.

CHANGE OF DUTIES OF COUNTY TREASURER.—The fact that after the election and qualification of a County Treasurer a law is passed by which his duties are changed or his salary is reduced, does not impair his official bond, or discharge his sureties from responsibility for his acts after the change is made.

RELEASE OF PART OF SURETIES ON OFFICIAL BOND.—A release of some of the sureties on a Treasurer's official bond by proceedings in insolvency, and a failure of the County Judge to summon the Treasurer to show cause why he should not execute an additional bond, does not release the remaining sureties from future liability on the bond.

APPEAL from the District Court, Sixth Judicial District, Sacramento County.

At the general election held in the fall of 1861, Bird was elected Treasurer of the City and County of Sacramento, to hold office two years from the 8th day of October, 1861. On the 1st day of October, 1861, he filed in the office of the County Clerk of Sacramento his official bond, without a seal opposite his own name. On or about the 10th day of September, 1863, Bird suddenly left the County of Sacramento, and a subsequent examination of his accounts showed the defalcation for which this action was brought. The copy of the bond set out in the complaint had a seal opposite Bird's name.

The other facts are stated in the opinion of the Court.

*H. H. Hartley*, for Appellant, argued that the demurrer should have been sustained, because the action ought to have been brought in the name of the people of the State of California, and because it did not aver that the plaintiff was the successor in interest to the City and County of Sacramento. He also argued that the Court erred in admitting the bond in evidence, because in the one offered there was a seal opposite Bird's name; and cited *People* v. *Hartley*, 21 Cal. 589; *Casteele* v. *Cornwall*, 5 Cal. 519; and *United States* v. *Linn*, 15 Pet. 311. He also argued that the Court erred in admitting evidence of any money retained by Bird for his commissions.

*George R. Moore*, also for Appellant, argued that by the

passage of the Act of April 25th, 1863, (Laws 1863, p. 503,) the office of City and County Treasurer was abolished, and another known as County Treasurer was created, and that the sureties on Bird's bond became liable for his acts as City and County Treasurer, and that their liability ceased, so far as future acts were concerned, after the Act of 1863 went into effect and he became County Treasurer; and cited *Brown* v. *Lattimore*, 17 Cal. 96 ; *People* v. *Aikenhead*, 5 Cal. 106. He also argued that the insolvency of a part of the sureties, and the failure of the County Judge to call for a new bond, discharged the other sureties; and cited Wood's Dig. 78, sec. 14; *People* v. *Buster*, 11 Cal. 218.

*M. M. Estee*, for Respondent, argued that the suit was properly brought in the name of the Supervisors; and cited Laws 1858, p. 267 ; and Laws of 1863, p. 503. He also argued that the Court did not err in admitting the bond in evidence, because its execution was not denied in the answer, and because the fact that Bird did not seal the bond was averred in the complaint, as required; and cited 1 Hittell's Dig., Sec. 9 ; *People* v. *Edwards*, 9 Cal. 286. He argued also that the Court did not err in receiving evidence of commissions retained by Bird for his services, because he had kept these commissions for his own use against the express provisions of the statute, (Laws 1861, p. 455, Sec. 114,) by which provisions the money that he retained for his commissions belonged to the county, and that Bird illegally retained it, as much so as any other money in his possession, and his sureties were liable for it.

By the Court, RHODES, J. :

Action upon the official bond of Bird as the Treasurer of the City and County of Sacramento. The breach assigned is in substance that in September, 1863, there was in the official custody of Bird, as the Treasurer of said county, the sum of one hundred and twenty-five thousand and forty-nine dollars

and fifty cents of the funds of said county, which it was his duty to safely keep, as provided by law; and that he unlawfully, and in violation of his duty, converted to his own use one hundred thousand dollars, parcel of said sum of money. After Bird absconded, it was ascertained that he was a defaulter in the sum of eighteen thousand seven hundred and eighty-five dollars and twenty cents. Judgment for that amount was rendered for the plaintiff, and all the defendants except Bird appeal.

### *Government of City and County of Sacramento.*

The defendants' first point is that the Court erred in overruling the demurrer to the complaint. Most of the questions arising under this, as well as several of the other points made by defendants, depend upon the construction of the Acts relating to the government of the City and County of Sacramento. By the Act of April 24th, 1858, (Statutes 1858, p. 267,) the government of the county and of the city, which before that time had been distinct, were consolidated—that is to say, a new government was created which constituted the government for the county, and at the same time the municipal government for the city. It was provided by the first section of the Act that "for the government of that territory known as the City and County of Sacramento, there shall be a Board of Supervisors; and the said Board of Supervisors and their successors in office shall be a body politic and corporate, under the name and style of 'The City and County of Sacramento,' and by that name they shall be known in law," etc. The territory that was to be subject to the government of the Board of Supervisors was the County of Sacramento, including therein the City of Sacramento. The county still remained, as before the passage of the Act, one of the political divisions of the State, its territorial limits not being changed, and the law under which it was organized not being repealed. Nor do we understand that the tract of land described in the Act of 1851 as the "City of Sacramento" was divested of its

status as a city by the Act of 1858; but, on the contrary, its limits are again defined in the fourth section of the Act, and in several of the sections it is recognized and described as the City of Sacramento.

There is, it is true, a manifest confusion in the use of terms employed in the Act, and a lack of precision that would be inexcusable in a legal document. The Act, instead of providing that the citizens residing within the limits defined shall constitute a body politic and corporate, declares that the Board of Supervisors and their successors in office shall be a body politic and corporate, under the strange name and style of "The City and County of Sacramento," and the Act constitutes the Board as the government of the territory, "now known as the City and County of Sacramento," when in fact there was no territory known by that name, nor was any portion of territory described or defined in the Act as constituting such city and county. The provisions of the Act, however, by a fair construction make it apparent that it was the intention to maintain the lines between the city and county as political divisions. The Supervisors and the President of the Board to be chosen at the special election were required to be elected by the legal voters of the county; the Board when organized were required "to divide that portion of the county outside of the city limits into four Supervisor districts, and that portion within the city into four Supervisor districts;" a Sheriff, a County Clerk, a Treasurer, a District Attorney, an Assessor, a President of the Board of Supervisors, etc., were required to be elected by the legal voters of the county; and a large portion of the duties to be performed by those officers were such as were required of them by law as county officers. On the other hand the Board of Supervisors were authorized to pass ordinances which were applicable only within the city; taxes were authorized to be levied upon the taxable property within the city and to be appropriated to municipal purposes; a system was devised for the improvement of the streets, distinct from that relating to highways outside of the city limits; a fire department was established for the city; the City School

Fund was directed to be kept distinct from other funds; and many other provisions are found in the Act going to show that it was not the intention of the Legislature, that the existence of the city, as a municipality and as a distinct political division should cease.

The true theory of the Act is that a new Board of Supervisors of the county was created, and they and the President of the Board were required to discharge not only their duties as Supervisors of the county, but also other duties affecting the city alone, of the general character of those formerly pertaining to the Mayor and Common Council of the city, whose offices were abolished by the repeal of the charter of 1851. And the same was the case with several other officers, (among whom was the Treasurer,) who, in addition to the duties of their offices as county officials, were required to perform certain duties on behalf of the city. The duties of those officers were not prescribed by the Act of 1858, except in some minor particulars, but were left subject to the regulations of the general laws. In respect to the Treasurer, certain rules were laid down for the better protection of the funds in the Treasury, but the great mass of his duties are to be found in the provisions of the general revenue laws defining the duties of County Treasurers. The Board of Supervisors could, by ordinance, impose duties upon him not inconsistent with the statute relating to the same subject matter, but the imposition of such duties and the special provisions of the Act of 1858 did not abrogate the office of County Treasurer of that county.

Two Acts were passed on the 25th of April, 1863, the one providing for the government of the County of Sacramento, (Stats. 1863, p. 503,) and the other reincorporating the City of Sacramento, (Stats. 1863, p. 415,) by which the municipal government of the city was separated from that of the county. By the first Act the Board of Supervisors to be elected under its provisions, was constituted a body politic and corporate for the government of the county, and all the property, claims, rights, etc., held or acquired for county purposes by "the City and County of Sacramento" were transferred to and

vested in the new corporation; and the Act of 1858 was repealed. The new Board was organized in 1863, and under the authority of the Act of its creation, it was empowered to commence and prosecute such actions as might be necessary in order to maintain and protect the rights, claims or demands of the county.

### *Plaintiff in action on official bond.*

The facts stated in the complaint being taken as true for the purposes of the demurrer, the action was properly brought in the name of the plaintiff, instead of the people of the State of California, for the money unlawfully converted by Bird, the Treasurer, being the money of the county, the county is the real party in interest, and the Act empowers the Board of Supervisors to sue in behalf of the county in the corporate name.

### *Not necessary to allege matter of law in complaint.*

It was unnecessary to allege in the complaint that the plaintiff is the successor in interest of " the City and County of Sacramento," as that was so declared by the Act of 1863. Nor was it necessary to allege that the money withdrawn by the Treasurer was formerly the money of the " City and County of Sacramento," for it may have accrued to the county after the dissolution of the corporation of 1858, or if received before that time, it may have been the money of the county.

If the money withdrawn by the Treasurer had belonged wholly or in part to the State, or to any person or body politic or corporation other than the county, the point urged by the defendants, that suit should have been brought in the names of the owners of the several funds, might arise, but when it is alleged that the money is the property of the county the point cannot be maintained on the ground that the law requires the moneys in the Treasury to be divided and kept in separate funds, for such a division and separation of the money does not affect or impair the title of the county.

### *Variance between pleading and evidence.*

The defendants' second point is that the Court erred in admitting in evidence the bond offered by the plaintiff because there was a variance between the bond as pleaded and offered in evidence.   The complaint contains a copy of the bond upon which the action is brought, and the answer denying the execution of the bond is not verified, and therefore, according to section fifty-three of the Practice Act, the due execution of the bond is admitted by the defendants.   And besides this, the fact that there was no seal opposite the name of Bird, was suggested in the complaint, as a defect, according to the provisions of section eleven of the Act of 1850, concerning official bonds, and that was sufficient to entitle the proper party to recover, notwithstanding the defect.   A further variance is suggested between the bond as pleaded and that produced in respect to its execution and delivery.   The allegation is that the Treasurer being elected, was required by law to procure and file with the County Clerk his official bond as such Treasurer, and that in consideration thereof, he as principal, and the other defendants as sureties, in October, 1861, " signed, sealed, executed and delivered to the said plaintiffs, and filed with said County Clerk of said county. a certain bond as his, said Charles L. Bird's official bond as such Treasurer, of which the following is a copy."

### *Filing of an official bond is a delivery.*

The bond does not show on its face to whom it was delivered, and on its production no question of variance in that respect would arise.   The execution of the bond is provided for by law, and when the bond, proper in form and substance, is signed and sealed by the obligors, and approved by the proper officer, and filed in the office appointed by law, it is both executed and delivered to the " People of the State of California."   It was impossible for the bond to have been executed or delivered to the plaintiff, because the corporation had

10

not then been created; and the averment that it was so exe-
cuted and delivered, being inconsistent with the averments
showing that it was executed and delivered to the State, as
well as impossible, must be disregarded. The rule that plead-
ings are to be construed most strongly against the pleader,
does not require such a construction to be given as will make
the pleading absurd. The allegation would have been suffi-
cient without the words " executed and delivered to the said
plaintiffs," and they may be disregarded as surplusage.

The third point—that the Court erred in admitting evidence
to show that any of the moneys abstracted by the Treasurer
belonged to the State—does not rest upon any evidence pre-
sented in the record. The money in the County Treasury
was presumptively the money of the county, and the money
illegally withdrawn by the Treasurer would be held to belong
to the county until the contrary was shown. The statement
of the Auditor was hypothetical, and not that a certain por-
tion of the deficiency was found in fact in the funds of the
State, and another portion in the funds of the county.

### Recovery on official bond of Treasurer for fees retained.

The fourth point is that the Court erred in admitting any
evidence as to the commissions retained by Bird for his ser-
vices as Treasurer. The Treasurer, during the term of his
office, retained for his own use the sum of four thousand seven
hundred and seventy-eight dollars and forty cents, which he
claimed as commissions on the money paid by him to the
Treasurer of State. Under the Revenue Act of 1861, (Stats.
1861, p. 453,) County Treasurers were allowed commission on
money paid over by them to the State, at the rate of three per
cent; and when the Treasurer paid a sum of money into the
State Treasury he deducted and retained therefrom three per
cent on the amount for his percentage, but took a receipt for
the whole sum. It is unnecessary to pass on the question,
whether it was his duty, under the Revenue Act, to have
returned to the County Treasury the money received by him
as commissions, on the ground that he received a stated

salary; for, admitting that such was his duty, no recovery can be had in this action for his default in that respect. The breach alleged in the complaint is that the Treasurer failed to keep the money of the county in the safe provided for that purpose, but unlawfully withdrew the same and converted it to his own use. The Revenue Act of 1861 (Sec. 107) authorized the Treasurer to receive a commission of three per cent on all moneys disbursed by him; and section one hundred and fifteen provides that " all fees and percentage allowed under the provisions of this Act, to any officer or officers, in any county, or in any city and county in this State where by provisions of law such officers receive a stated salary, shall be received by such officer and paid into the County Treasury, or City and County Treasury, for the use of the county, or city and county," etc. The retention by the Treasurer of the commissions at the time of the payment to the Treasurer of State was not only authorized but was required by law; and the malfeasance on his part, if the county was entitled to the money so retained by him, consisted in his failure to pay the money into the County Treasury. No breach of the conditions of the bond is alleged under which a recovery could be had for this default of the Treasurer.

The alleged error of the Court in denying the defendants' motion for a nonsuit is their fifth point. In support of the motion it is urged that the office to which Bird was elected, ceased to exist before the alleged defalcation, and that when the defalcation occurred he held a different office. This position has been answered by the construction we gave to the Acts relating to the County, and the City and County of Sacramento. It is proper to add that the defalcation occurred before the expiration of the term for which he was elected; and that although the Act of 1863, for the government of the county, was passed before the defalcation took place, that Act provides, in section seven, that " the officers in this section mentioned, (among whom is the Treasurer,) elected at the general election in the year 1863, shall hold office during the term for which they were elected, and until their successors

are elected and take office under this Act." And so, the term of office to which he was elected had not ceased in fact or in law, when the alleged defalcation took place. If it could be made to appear that at the time of the defalcation the office of Treasurer, to which Bird was elected, had been abrogated, and that by legislative appointment he was the incumbent of a different office, then the argument of the defendants' counsel would have a very forcible application, if it would not be conclusive of the question.

### Change in duties of an officer by law.

The fact that changes were made in the duties of the office by the Act of 1863, by which the Treasurer was relieved of the custody of the funds of the city, and his salary was reduced, etc., did not impair the bond or discharge the sureties from responsibility for the subsequent acts or defaults of the Treasurer. The provisions of section eight of the Act of 1850, concerning official bonds, that the bond shall be obligatory ".for the faithful discharge of all duties which may be required of such officer, by any law enacted subsequent to the execution of such bond," provides for the contingency of a change in the duties of the office of the character of that found in this case. An increase or diminution of the salary or fees attached to the office has never been held to work a change in the office, or to operate as a release of the sureties upon the official bond.

### Insolvency of a part of sureties on official bond.

The sixth point, that the sureties were discharged because some of them became insolvent and others removed from the State, and the County Judge failed to summon the Treasurer to show cause why he should not execute an additional bond, is clearly untenable. Those proceedings are instituted for the protection of the obligees, and not the obligors; and besides, the original bond remains in force after the execution of the . additional bond. (Act of 1850, concerning official bonds, Sec 19.) The defendants' argument is that some of the sureties

were released by proceedings in insolvency, and others in consequence of their removal from the State; and that under the familiar rule, that the release of one operates as a release of all the sureties, the defendants were discharged from all future liability on the bond.   There are two objections to the argument.   The release of one surety to the bond, contemplated by the rule, is an express release by the obligee, or a release by operation of law, at his instance or by his procurement. It must be his express act, or the direct result of his act, so that it may be said that he released the surety.   Second— Neither the discharge in insolvency, nor the removal from the State of certain of the sureties, released them from future liability on the bond.   The case of the *People* v. *Buster*, 11 Cal. 215, relied on by the defendants, is not in point, for there a part of the sureties were released by order of the County Judge from all future liability on the bond, and such release was, in law, the act of the obligees.   A new bond was executed, which, from the time of its execution, took the place of the first bond, and the defalcation occurred after the execution of the second bond.

The last point needs no special consideration, as it has been virtually disposed of in passing on the other points.

The plaintiff not being entitled under the allegations of the complaint to recover the amount of the commissions retained by the Treasurer—four thousand seven hundred and seventy-eight dollars and forty cents—it is ordered that the judgment be reversed and the cause remanded for a new trial, unless the plaintiff, within thirty days from this date, shall file in this Court a release of the said sum of four thousand seven hundred and seventy-eight dollars and forty cents, part of the judgment; and that upon such release being filed, the judgment of the Court below be affirmed for the remainder thereof.

SAWYER, J., concurring specially:

I can perceive no good reason for deducting the four thousand seven hundred seventy-eight dollars forty cents appro-

priated by Bird as commissions. These commissions clearly belonged to the county, (Laws 1861, p. 455, Secs. 114 and 115; and *Patton* v. *Placer County*, 30 Cal. 175,) and they came into the possession of Bird as Treasurer of Sacramento County. It was his duty to keep these moneys and pay them over in the same manner as the other funds of the county were required to be kept and paid over; and I think their appropriation to his own use within the breach assigned. I concur in the conclusions attained by a majority of the Court in other respects, and think the judgment of the District Court should be affirmed.